## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

THOMAS KLEIN,                                            Civil Action No. 1:06-cv-164

      Petitioner,                                        Dlott, J.
                                                        Black, M.J.
      vs.

SIMON LEIS, JR.,

      Respondent.

_____

## REPORT AND RECOMMENDATION
_____

Petitioner, an inmate in state custody at the Hamilton County, Ohio, Justice Center, brings this action *pro se* pursuant to 28 U.S.C. § 2241 seeking to halt his prospective retrial on state felony charges and to obtain his release from the custody of the Hamilton County, Ohio Court of Common Pleas.  Petitioner asserts that continuing his criminal prosecution violates the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution.

This case is now before the Court on the petition (Doc. 3), respondent's return of writ and motion to dismiss (Doc. 12), petitioner's reply and supplemental memoranda (Docs. 13, 16), and respondent's supplemental return of writ (Doc. 19).

**Procedural Background**

On April 8, 2005, the grand jury of Hamilton County, Ohio indicted petitioner on two counts of aggravated burglary in violation of Ohio Rev. Code § 2911.11(A)(2), with firearm specifications [Counts 1 and 6], three counts of kidnapping in violation of Ohio Rev. Code § 2905.01(B)(2), with firearm specifications [Counts 2, 3, 4], one count of kidnapping in violation of Ohio Rev. Code § 2905.01(B)(2) [Count 5], one count of receiving stolen property in violation of Ohio Rev. Code § 2913.51(A) [Count 7], and one count of having weapons while under disability in violation of Ohio Rev. Code § 2923.13(A)(2) [Count 8].  (Doc. 12, Case No. B 0502958, Indictment of 4/8/05).

On February 7, 2006, a jury was empaneled and sworn and petitioner's criminal trial commenced.  (Doc. 12).  The first morning of trial, petitioner, who was representing himself, proceeded with his opening statement.  Petitioner was secured with an electronic stun belt[1] secured around his waist and under his clothing as he was considered a maximum security risk.  Throughout petitioner's opening statement, the trial judge repeatedly sustained the prosecuting attorney's objections to petitioner's repeated mischaracterizations of the evidence, the law governing his case, and the court system.  At the conclusion of his opening statement, petitioner told the jury he was "being treated like Hannibal Lector" and that he could not sit "all the way back in his chair because I got

---

[1] When activated, the stun belt sends electrical currents through the wearer's body causing incapacitation.  Activation may also cause immediate and uncontrolled defecation and urination.  *See* *Gonzalez v. Pliler*, 341 F.3d 897, 899 (9th Cir. 2003) (citations omitted).

this electrical shocker strapped to me" and lifted his shirt to show the jury. (Doc. 12,

2/7/2006 transcript at 48). The prosecuting attorney objected and moved for a mistrial.

*Id*. The trial judge, after briefly questioning the petitioner, granted the motion for

mistrial. *Id*.

On February 27, 2006, petitioner moved to dismiss the indictment, arguing that his

reprosecution would violation the double jeopardy provision of the Fifth Amendment.

(Doc. 12, 2/27/06 motion to dismiss). On March 6, 2006, the trial judge issued an

opinion explaining his decision to declare a mistrial. (Doc. 12, 3/5/06 opinion on

granting motion for mistrial). Thereafter, petitioner filed a request for an evidentiary

hearing and supplemental memoranda in support of his motion to dismiss. (Doc. 12,

journal entries of 3/20/06). On April 3, 2006, petitioner filed a second motion to dismiss

based on an alleged denial of due process and destruction of material evidence. (Doc. 12,

4/3/06 motion to dismiss). On April 24, 2006, the trial court issued an entry overruling

"Defendant's Motion to Dismiss Case." (Doc. 19, 4/24/06 entry). Trial has now been

rescheduled to commence on June 5, 2006 (*i.e.*, within three weeks). (Doc. 19, case

schedule).

Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2241 on March 23, 2006, asserting that his continued prosecution and custody

are barred by the Double Jeopardy Clause. (Doc. 3, Habeas Petition).

## OPINION

Respondent has filed a one page return of writ and motion to dismiss in which he contends that petitioner has failed to exhaust his state court remedies, and that an order staying the state court proceedings until this Court rules on the petition is unwarranted and unnecessary to protect petitioner's rights to a fair trial. Instead, respondent asserts that should petitioner be convicted after a retrial, he may challenge his conviction and the declaration of a mistrial on direct review. (Doc. 12 at 1).

Not only is respondent's return of writ and motion to dismiss wholly inadequate for failing to set forth any citation to any legal authorities relied upon or a memorandum in support thereof, *see* S.D. Ohio Civ. R. 7.2(a)& (b), respondent is simply incorrect as a matter of law.

Respondent preliminarily asserts that petitioner has failed to exhaust his state court remedies and that petitioner's Fifth Amendment Double Jeopardy claim can be addressed subsequent to any conviction on appeal. However, the Sixth Circuit has rejected these two related arguments in the Double Jeopardy context.

In *Harpster v. Ohio,*128 F.3d 322, 324 (6th Cir. 1997), *cert. denied,* 522 U.S. 1112 (1998), the Sixth Circuit explained that because the Double Jeopardy Clause protects against being twice tried or placed in jeopardy, not just being twice punished, federal adjudication of such claims on a pre-trial basis is appropriate and required. Otherwise, the petitioner would not enjoy the full protection of the Clause nor avoid "exposure" to double jeopardy. 128 F.3d at 324.

4

With respect to exhaustion, the Sixth Circuit requires that the claim be raised and rejected in the state trial court, and that there exist no right to interlocutory appeal. *Id.*; *see Johnson v. Karnes,* 198 F.3d 589, 592 n.2 (6th Cir. 1999). Petitioner satisfies both these requirements. He filed a motion to dismiss the second trial on Double Jeopardy grounds which the trial court denied (Doc. 12, 2/27/06 motion to dismiss; (Doc. 19, 4/24/06 entry), and the order overruling the motion to dismiss on double jeopardy grounds is not a final appealable order in Ohio. *See Harpster,* 128 F.3d at 326. Accordingly, federal adjudication is required at this time. *Id.*

Despite the inadequacies of respondent's return of writ, the Court on its own has examined the double jeopardy ramifications of a re-trial of petitioner in this matter and will address the merits of the claim below.[2]

The Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The guarantee against double jeopardy, made applicable to the states through the Fourteenth Amendment, *Benton v. Maryland,* 395 U.S. 784, 794 (1969), protects against "a second prosecution for the same offense after conviction or acquittal." *Palazzolo v. Gorcyca,* 244 F.3d 512, 516 (6th Cir. 1989).[3]

The Double Jeopardy Clause protects individuals "not against being twice

---

[2] This Court has previously thoroughly examined the double jeopardy implications of a second retrial following the declaration of a mistrial. *Doriott v. Court of Common Pleas, Warren County, Ohio*, Case No. 1:05-cv-292, 2005 U.S. Dist. LEXIS 20017, at *5 (S.D. Ohio Sept. 14, 2005) (adopting the Report and Recommendation entered Aug. 24, 2005 (Doc. 12)).

[3] Citing *Ohio v. Johnson,* 467 U.S. 493, 498 (1984) and *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)), *cert. denied,* 534 U.S. 828 (2001).

punished, but against being twice put into jeopardy." *Ball v. United States,* 163 U.S. 662, 669 (1896).  A defendant is placed in jeopardy in a criminal proceeding when he is put to trial before the trier of fact, either a judge or jury.  *United States v. Jorn,* 400 U.S. 470, 479 (1971).  In the case of a jury trial, jeopardy attaches when the jury is seated and sworn. *Crist v. Bretz,* 437 U.S. 28 (1978).

The Double Jeopardy Clause ensures the finality of criminal judgments and also protects a defendant's "right to have his trial completed by a particular tribunal."  *Jorn,* 400 U.S. at 484; *see also Arizona v. Washington,* 434 U.S. 497, 503 (1978).  "The public interest in the finality of criminal judgments is so strong that an acquitted defendant may not be retried even though 'the acquittal was based upon egregiously erroneous foundation.'"  *Washington,* 434 U.S. at 503 (quoting *Fong Foo v. United States,* 369 U.S. 141, 143 (1962)).

The Double Jeopardy Clause reflects the idea that:

the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty.

*Green v. United States,* 355 U.S. 184, 187-188 (1957).

Nonetheless, the Double Jeopardy bar is only absolute "when there is a dismissal or acquittal based on a factual determination of innocence."  *Scott,* 437 U.S. at 94.

When, as here, a criminal prosecution ends without finally resolving the merits of the charges, retrial is not automatically prohibited.  The defendant's right to have his trial

6

completed by one tribunal is subordinated to the public's interest in "fair trials designed to end in just judgments" because of the myriad of circumstances which may necessitate discharging a jury, many of which do not "invariably create unfairness to the accused." *Washington,* 434 U.S. at 505; *see also United States v. Cameron,* 953 F.2d 240, 242 (6th Cir. 1992).

Where the trial has not ended in conviction or acquittal, reprosecution is permitted when the defendant either requests or consents to a mistrial (so long as the government did not provoke the request) or when the mistrial is justified by "manifest necessity." *DiFrancesco,* 449 U.S. at 130; *United States v. Dinitz,* 424 U.S. 600 (1976).

Here, the petitioner did not consent to the mistrial.

Accordingly, in the absence of a defendant's consent to a mistrial, and in light of the importance of a defendant's right to have his case tried by the original tribunal and a mistrial's frustration of that right, the prosecutor has the "heavy burden" of justifying the mistrial by demonstrating "manifest necessity."  *Washington,* 434 U.S. at 505.[4]

Manifest necessity is defined as a "high degree" of necessity, but not an absolute degree of necessity. *Id.* at 506; *see Harpster,* 128 F.3d at 328.  The "classic formulation" of the manifest necessity test dates back to an 1824 opinion by Justice Story of the United States Supreme Court, stating:

---

[4] *See also Corey v. District Court of Vermont, Unit #1, Rutland Circuit,* 917 F.2d 88, 90 (2nd Cir. 1990); *Crawford v. Fenton,* 646 F.2d 810, 817 (3rd Cir.), *cert. denied,* 454 U.S. 872 (1981).  *But cf. Venson v. Georgia,* 74 F.3d 1140, 1146 (11th Cir. 1996) (on habeas corpus review, court must assume state trial judge found manifest necessity).

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated.  They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.  To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes. . . .but, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

*United States v. Perez,* 22 U.S. 579, 580 (1824); *see also Washington,* 434 U.S. at 506.

The United States Supreme Court has eschewed the formulation of rules based on categories of circumstances which allow or prohibit retrial, or rules based on the source of the problem causing the mistrial or the beneficiary of the ruling.  *Jorn,* 400 U.S. at 480, 486.  Instead, trial courts are directed to refrain from aborting a trial until a "scrupulous exercise of judicial discretion" leads them to conclude that justice would not be served by continuing the proceedings.  *Id.* at 484.

A reviewing court must afford deference to the trial court's determination of manifest necessity.  *Washington*, 434 U.S. at 511.  The amount of deference depends on the basis for the mistrial.  When, as here, the trial court's decision to declare a mistrial is because the trial judge believes that the jury's impartiality may be compromised, the trial court's determination is accorded great deference.  *Id.* at 509-511.

In determining whether a trial judge exercised sound discretion in declaring a mistrial, a reviewing court considers factors such as whether the trial judge heard the

8

opinions of the parties about the propriety of the mistrial, whether he considered the alternatives to a mistrial, whether he acted deliberately, instead of abruptly, and whether the defendant would benefit from the declaration of a mistrial.  *Washington,* 343 U.S. at 515-516; *Cameron,* 953 F.2d at 246.

A trial judge is not required to make an explicit finding of manifest necessity or to explain his mistrial ruling.  *Washington,* 343 U.S. at 516-517.  Yet, the exercise of discretion "stands on much firmer ground" when, as here, "it is apparent on the face of the record the reasons for a particular decision, and the analytic process leading to that conclusion."  *Glover,* 950 F.2d at 1241.

A trial judge exercises "sound discretion" when he engages in "careful consideration and solicitude for the serious consequences attendant upon mistrial."  *Karnes,* 198 F.3d at 596 (quoting *Glover,* 950 F.2d at 1241).

In the instant case, the trial judge declared a mistrial and discharged the jury at the conclusion of petitioner's opening statement.  In a subsequent written opinion, the trial judge explained his reasons for declaring a mistrial:

> "During the defendant's opening statement the defendant, pro se, continually attempted to bias the jury by appealing to their sympathy.  He at no time actually described the evidence he was going to produce at trial which is of course the purpose of an opening statement.
> Klein explained the function of the prosecutor and Court personnel "as the function of a machine" who were subject to bias and prejudice against him.  Similar[ly] he "stated" to a thousand years ago when it wasn't uncommon for some conniving ulterior minded people to make false allegations against them which would bring the wrath of the trier of fact. . ."  Then Mr. Klein invoked the Ten Commandments, particularly the prohibition on bearing false witness contained therein.  Mr. Klein then goes on to state "and what is

the natural presumption to believe the person pointing the finger like he likes to do.  For instance what is your first thought when you see someone in chains standing before a Judge like me?"  Klein then noted that in ancient times there were severe punishments meted out to false accusers, but "people are a little bit more bold nowadays especially if they have the police and government officers to back them up even go so far as to make their lies more believable which has happened in this case."  Continuing on Klein states "and then there's the fact this man is mad, so understand you probably already have a presumption of guilty right now. . ."

The next argument was a description of the situation when Klein was a "piñata at a piñata party" because he was indicted by the Grand Jury which was just another move along the conveyor belt of the justice system.  Then Klein describes how it is "the prosecutor's dream to turn the jury into a rubber stamp."  He added "He (the prosecutor) is not in the business of searching for the truth.  His mission is to convict, plain and simple!"  He then describes his belief that there is a presumption of guilt and that the "law wistfully talks about presumption of innocence.["]

However, these were just his preliminary allegations leading to more egregious statements about the trial of the case later on.  Klein stated, "It's probably not often when someone can say that not only perjury will happen but that it will be exposed, whether it will expose it now or a thousand years, and it's not easy now, especially with help.  But I'm comfortable in saying I can because these people are drunk.  By that I mean drunk on power which has the same intoxicating effect as liquor.  They have been abusing their power so long they've gotten sloppy and wrench (sic), uncoordinated.  Again, they're so used to doing as they please and allowing reality to reflect what they want it to, but they have stopped me from trying to disguise the corruption and abuse of power too well.  Pretty annoying but also pretty scary.  It means they've gotten too bold, they've gotten away with it too long. . .  It's also the reason I'm representing myself rather than letting of their lackeys leads me to the gas chamber, lead me to conviction.  This is in many ways like a meat grinder.  It doesn't work too well when it's all clogged up with lawyers who try to stop it from grinding.  And that is what this jury trial is, a fight to stop the grinding from dicing me up."

Klein then accused the prosecutor of destroying evidence, the Court of speaking down to him, and told the jury the Court had engaged in friendly banter with the prosecutor.  He went on to say the Court wanted to "get this over with that's right, can't say I'll roll over and play possum with a billy

club while they stomp me."

Klein then went on to say "I was going to ask the judge to let us all go there as part of this trial, it's called a jury view, but I didn't waste my breath" insinuating the Court would have denied a proper request for a view of the premises.

Finally, Klein compared himself to being treated to like Hannibal Lector and raised his shirt showing his shock belt to the jury.  He admits he knew he could have been shocked by the deputies for tampering with belt but tampered with it anyway.

All of these actions on Mr. Klein's part during the opening statement the Court finds to have been intentional.  He continually tried to improperly taint the jury by creating bias and/or sympathy for his position which was intended to benefit his interests at trial."

(Doc. 12, 3/5/06 opinion on granting motion for mistrial at 1-3).

The trial judge then examined Ohio law on the issue of prejudicial misconduct during trial and the duty of the court to ensure a fair trial for all parties.  The trial judge determined that petitioner's statements concerning the "conspiratorial elements of felony prosecutions in Hamilton County, Ohio" were prejudicial and  misleading to the jury, and that petitioner knew his assertions would not be supported by any evidence at trial.  The trial judge went on to examine the duty of the court in regulating the conduct of counsel and the parties during opening statement to ensure a fair and impartial trial.  Specifically, the trial noted the limited options for controlling the conduct of *pro se* litigants and the careful balance the court must strike in granting leeway to and educating a *pro se* litigant on the rules of procedure to ensure the orderly progression of the case and in controlling the recalcitrant *pro se* litigant who seeks to gain an unfair advantage through his knowing

misconduct.

Reiterating the court's duty to ensure a fair trial of the issues and to "take whatever steps are necessary under the circumstances presented to prevent any unfair advantage being gained by either side," the trial judge stated:

> "In this case Mr. Klein presented his opening statement over a period of 25-30 minutes. Approximately 3-5 minutes were devoted to the proper purposes of an opening statement. The other 20-25 minutes of Klein's opening statement were devoted to varying degrees of abuse of his right to make an opening statement. Some phrases were subtle but others were direct and obvious. Mr. Klein's intent was obvious from his words and his demeanor. He was attempting to confuse the jury in regard to what their function was to be during the trial. He converted their duty from a search for the truth and weighing the evidence to a duty to find him to be the victim of a systematic conspiracy by the police, the witnesses, the prosecutor, assigned counsel and the Court commit. A review of the transcripts of the proceedings will demonstrate this is Klein's plan of defense, putting the justice system on trial instead of the issue of whether or not the state can prove Klein is guilty of the crimes charged beyond a reasonable doubt.

> The grand finale of the defendant's improper opening statement was his exposure of the stun belt he was wearing, and complaining to the jury he could not properly represent himself because of the belt. When Mr. Klein exposed the belt he also began to tamper with it. The deputies reached for their stun belt buttons but the prosecutor quickly moved for a mistrial which the Court granted so he was not stunned. Klein admitted he was surprise[d] he was not stunned, because he was told by the deputies not to tamper with the belt or he would be stunned. His sole purpose in exposing the belt was to appeal to the sympathy of the jury with a dramatic example of how he was being unfairly treated by the justice system.
> The Court had decided when the State proved by clear and convincing evidence that Klein was a maximum security risk at a pretrial hearing, to use the shock belt rather than shackles. It so ruled to ensure the jury would not be aware of his security status, and to prevent any prejudice to the defendant arising out of his appearing pro-se before the jury wearing restraints. The shock belt was not visible as it was covered by Klein's clothing. This model stun belt can be compared to a cummerbund. It cannot be seen under clothing. Klein was wearing a loose fitting top so no outline of the belt was visible. Throughout voir dire and opening statement the Court did not

observe that the belt in any way interfered with his presentation of his defense.

When Klein exposed the belt and commented to the jury that the belt was hindering him in the presentation of his defense, the Court immediately realized the sum and substance of Klein's opening statement had compromised the possibility of a trial before a fair and impartial jury. The situation which was created was only resolvable by declaring a mistrial. If the Court overruled the motion for a mistrial the defendant would gain an unfair advantage by contaminating the jury through his opening statement–moving them to be sympathetic to him because of the way he was being treated. On the other hand if the Court had tried to use a curative instruction to preserve the trial, it would have tainted the jury against the defendant. If the Court explained why Klein was wearing the shock belt to the jury, it would have required the Court to inform the jury that Klein had been found to be a maximum security risk for escape.

If the Court had used such a curative instruction it would have been plain error even though it was invited error by the defendant.

Therefore, the granting of the motion for a mistrial was under the circumstances the only way to preserve the right to a fair and impartial trial to the defendant and the State."

(Doc. 12, 3/5/06 opinion on granting motion for mistrial at 7-9).

## **Standards of Review**

The standards established by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104- 132, 110 Stat. 1214 ("AEDPA"), govern this Court's review of a state trial court's decision when pre-trial habeas corpus petitions are brought to protect a petitioner's rights under the Double Jeopardy Clause. *See Johnson,* 198 F.3d at 592; *Harpster,* 128 F.3d at 326. Under the AEDPA, a writ of habeas corpus may not issue with respect to any claim adjudicated on the merits in state court unless the adjudication either:

     1.     resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2.    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The phrases "contrary to" and "unreasonable application" have independent meanings:

> A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the law set forth in ... [Supreme Court] cases, or if it decides a case differently that we have done on a set of materially indistinguishable facts.  The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from ... [the Supreme Court's] decisions but unreasonably applies it to the facts of a particular case.  The focus on the latter inquiry is whether the state court's application of clearly established federal law is objectively unreasonable ... and an unreasonable application is different from an incorrect one.

*Bell v. Cone*, 535 U.S. 685, 694 (2002)(citation omitted).

## <u>Analysis</u>

Upon review of the entire record, this Court concludes that petitioner has failed to establish that the findings of the state trial court are unreasonable so as to justify federal habeas corpus relief.  *See Williams v. Taylor*, 529 U.S. 362 (2000).

The relevant Supreme Court precedent on the double jeopardy issue in this matter is set forth in *Arizona v. Washington,* 434 U.S. 497, 503 (1978).  Therein, the Supreme Court explained that an improper opening statement can provide the basis for a mistrial, as follows:

> An improper opening statement unquestionably tends to frustrate the public interest in having a just judgment reached by an impartial tribunal.  Indeed, such statements create a risk, often not present in the individual juror bias situation, that the entire panel may be tainted.  The trial judge, of course, may instruct the jury to disregard the improper comment.  In extreme cases, he may discipline counsel, or even remove him from the trial. . . .  Those actions, however, will not necessarily remove the risk of bias that may be created by improper argument.  Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases.  The interest in orderly, impartial procedure would be impaired if he were deterred from exercising that power by a concern that any time a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred.  The adoption of a stringent standard of appellate review in this area, therefore, would seriously impede the trial judge in the proper performance of his "duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop . . . professional misconduct."

434 U.S. 497 at 512-13 (internal citations and footnotes omitted).

The Supreme Court recognized that "the extent of the possible [jury] bias cannot be measured" and that some judges, unlike the judge in Washington's trial, may have given a cautionary instruction and proceeded with trial.  *Id*. at 411.  Nonetheless, the Court determined that "the overriding interest in the evenhanded administration of justice" required that "the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment" be accorded "the highest degree of respect."  *Id*.

The Supreme Court reasoned that the trial judge is in the best position to evaluate the significance of particular statements for possible juror bias:

> He has seen and heard the jurors during their voir dire examination.  He is the judge most familiar with the evidence and the background of the case on trial.  He has listened to the tone of the argument as it was delivered and has

15

observed the apparent reaction of the jurors.  In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.

434 U.S. at 513-14 (internal citations omitted).

Accordingly, in recognition of these considerations, the Supreme Court concluded that "the trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact of improper argument is entitled to great deference. . . ." *Id*. at 514.

In the instant case, petitioner's opening statement was clearly improper.  The purpose of opening statement "is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument.  *United States v. Dinitz*, 424 U.S. 600, 612 (1976) (Burger, concurring).  Here, contrary to law:

Petitioner did not set forth the evidence he intended to present at trial, but rather used his opening statement as a vehicle for argument, which is inappropriate.  (Doc. 12, Tr. 2-12, describing the role of the jury during deliberations).  *United States v. Dinitz*, 424 U.S. at 612.

Petitioner made statements wholly unrelated to the factual issues to be tried and which could not be supported by evidence at trial.  For example, petitioner repeatedly misstated the law on which the jury was to be instructed, referring to a "presumption of guilt" (Doc. 12, Tr. 13, 20, 42 ) and mischaracterizing the standard for "reasonable doubt." (Tr. 33, 35).

Petitioner repeatedly made references to capital punishment, a penalty unrelated to

16

the crimes for which he was charged. (Doc. 12, Tr. 23 ["I'm representing myself rather than letting one of their lackeys lead me to the gas chamber"]; Tr. 25 [referring to being dragged to the guillotine]; *see also* Tr. 31).

Petitioner also criticized and mischaracterized the role of the court and the office of the prosecutor (Doc. 12, Tr. 16, 18-19, 20, 22, 24, 27, 32, 43-44), characterized the witnesses as "innocent" or "bad guys" (Doc. 12, Tr. 36-37), and impugned the integrity of the judicial system. (Doc. 12, Tr. 15 [referring to himself as the "piñata" and the ordeal of his criminal prosecution as a "piñata party"]; Tr. 45 [stating "I'm up against a powerful intelligence and extremely experienced force in here, and I'm just a pesky fly taking up time"]; *see also* Tr. 18, 23, 45).

Petitioner insinuated the trial judge would have arbitrarily denied any request for a jury view, stating "I was gonna ask the judge to let us all go there as part of this trial, it's called a jury view, but I didn't even waste my breath." (Doc. 12, Tr. 46 ).

Petitioner improperly appealed to the jury's sympathy, stating "the outcome of this case decides the rest of my life and whether two kids grow up with a dad or not." (Doc. 12, Tr. 30).

Petitioner accused the prosecutor of destroying evidence, knowing that the judge had previously ruled such evidence was properly destroyed in the normal course of business and was not requested during discovery. (Doc. 12, Tr. 38-41).

Petitioner then likened himself to "Hannibal Lector" while lifting his shirt to reveal the stun belt fastened around his waist and intimated he was being treating unfairly and

17

hindered in presenting his defense "because I got this electrical shocker strapped to me." (Doc. 12, Tr. 48).  Petitioner then began to tamper with the belt which made the deputies reach for their stun belt buttons.  At this point, the prosecutor moved for a mistrial, which the trial judge granted, in part to prevent the petitioner from being shocked or stunned.

The record reflects that petitioner's opening statement was clearly a calculated attempt to influence the jury by portraying himself as the "victim" of an unjust judicial system.

Based on the totality of the unique circumstances presented by this case, the trial judge reasonably determined that petitioner's misconduct during opening statement may have likely affected the impartiality of the jurors.  The trial judge's decision to declare a mistrial based on possible juror bias is entitled to great deference by this Court. *Washington*, 434 U.S. at 514.

In addition, the Court finds that the trial judge exercised "sound discretion" in declaring a mistrial in this matter.

In making this determination, the Court must take into consideration all the circumstances, including whether the trial judge acted "irrationally or irresponsibly" or precipitously, whether the parties were given an opportunity to explain their positions on the matter, and whether the trial court showed sufficient caution before its declaration. *Washington*, 434 U.S. at 514; *Perez,* 22 U.S. at 580; *United States v. Gantley*, 172 F.3d 422, 429 (6th Cir. 1999).

Petitioner contends the trial judge acted hastily by declaring a mistrial

18

"immediately" after petitioner exposed his stun belt to the jury.  However, contrary to petitioner's argument, the record reveals the trial judge reflected on petitioner's misconduct throughout his entire opening statement.

The judge repeatedly sustained the prosecutor's objections to petitioner's misstatements and mischaracterizations and several times admonished petitioner on the inappropriate nature of his opening statement.  Despite the judge's repeated attempts to educate petitioner on the proper scope of an opening statement, petitioner persisted in the same vein.

Mid-way through petitioner's presentation, the trial judge warned him to "keep your opening statement in perspective, proper perspective" or "you'll have to sit down." (Doc. 12, Tr. 25).  Shortly thereafter, the judge warned petitioner he would declare a mistrial if petitioner persisted with his misconduct. (Doc. 12, Tr. 31).

At that point, the transcript reveals the judge recognized that petitioner was attempting to influence the jury by playing on their sympathies.  (Doc. 12, Tr. 32).  The judge later warned petitioner to bring his opening statement to a close, stating, "Bring it together, sir.  It's over.  Criticizing counsel is highly inappropriate, and if you were an attorney, I would have fined you by now." (Doc. 12, Tr. 43).

By the time petitioner lifted his shirt to reveal the stun belt, the trial judge had had approximately 30 minutes to ponder petitioner's continued misconduct and disregard of the court's admonishments.  The trial judge was able to observe petitioner's tone and demeanor throughout his opening statement and the apparent reaction of the jury thereto.

19

While it is true that the trial judge did not give petitioner an opportunity to argue against a mistrial at the point a mistrial was actually declared, it is doubtful that any useful purpose would have been served by halting the trial to hear argument.  The jury had been repeatedly exposed to petitioner's misconduct, and it was too late to "unring the bell."

Petitioner also contends that the trial judge cannot be found to have exercised sound discretion because he failed to consider alternatives before declaring a mistrial.  The fact that the trial judge did not make a contemporaneous, explicit finding of "manifest necessity" or explicitly address the propriety of alternative solutions to the problems presented by petitioner's improper remarks and actions when the judge declared a mistrial is not determinative in this case.  Where "the record provides sufficient justification for the State court ruling, the failure to explain that ruling more completely does not render it constitutionally defective."  *Washington*, 434 U.S. at 516-17;  *see also Glover v. McMackin*, 950 F.2d 1236, 1241 (6th Cir. 1991).  Although the alternatives to a mistrial were not communicated to the parties at the time the mistrial was declared, the trial judge's subsequent opinion sets forth the alternatives he considered before declaring the mistrial and the reasons such alternatives were unavailing.

In this case, as in *Washington*, the trial judge declined to issue a curative instruction, believing such a remedy would be insufficient to address the potential bias faced by petitioner once he exposed his stun belt to the jury.  Here, the record in this case evinces a much stronger likelihood of juror bias than in *Washington*, in that the trial judge's decision to declare a mistrial was not precipitated by a single misstatement on the

20

part of the defense, but by the cumulative effect of a series of misrepresentations and innuendo, culminating in the exposure of petitioner's stun belt to the jury.

Moreover, as the Supreme Court noted in *Illinois v. Allen*, 397 U.S. 337, 344 (1970), the sight of physical restraints may have a significant effect on the jury. "There can be little question that the holdings of the Supreme Court reflect a strong concern that trial practices such as shackling can have substantial or injurious influences on jury verdicts. The holdings in *Estelle* and *Holbrook*, especially, effectively state that indicia of guilt, such as shackles, impose a significant level of harm upon the presumption of innocence, and that the injurious influence of such harm can only be overcome by a confident finding that the indicia were warranted or that the outcome of the defendant's case was not affected." *Ruimveld v. Birkett*, 404 F.3d 1006, 1014 (6th Cir. 2005) (citing *Estelle v. Williams*, 425 U.S. 501, 512-13 (1976); *Holbrook v. Flynn*, 475 U.S. 560, 568-69 (1986)).

Courts have found inherent prejudice to a defendant who is shackled while in the courtroom. *See Deck v. Missouri*, __ U.S. __, 125 S.Ct. 2007, 2009 (2005);[5] *Lakin v. Stine*, 431 F.3d 959, 966 (6th Cir. 2005) (recognizing the inherent prejudice of shackling); *Kennedy v. Cardwell*, 487 F.2d 101 (6th Cir. 1973), *cert. denied*, 416 U.S. 959 (1974) (inherent prejudice to be manacled or shackled while in the courtroom during trial).

Although petitioner in the instant case was restrained by a stun belt, as opposed to

---

[5] "The Constitution forbids the use of visible shackles during the penalty phase, as it forbids their use during the guilt phase, unless that use is justified by an essential state interest–such as the interest in courtroom security–specific to the defendant on trial."

shackles, the same concerns posed by such restraints are present.  *United States v. Durham*, 287 F.3d 1297, 1306 (11th Cir. 2002) ("[S]tun belts plainly pose many of the same constitutional concerns as do other physical restraints, though in somewhat different ways.").  In fact, if seen by the jury, the stun belt "may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant."  *Durham*, 287 F.3d at 1305 (quoting *State v. Flieger*, 91 Wash. App. 236, 955 P.2d 872, 874 (1998)).

It is undisputed that the judge and jurors observed petitioner's stun belt.  The trial judge observed the deputies reaching for their stun belt activation buttons, and it is likely some of the jurors may have observed the maneuvering of the deputies as well.  The jury's observation of petitioner's stun belt was inherently prejudicial to petitioner, and coupled with his "Hannibal Lector" comments, strongly suggested he could be guilty, as well as a dangerous individual.  A curative instruction in this case would have required the judge to inform the jury that petitioner was a maximum security risk for escape, implying special force was required to control petitioner.  Moreover, discharge of the stun belt could have presented the possibility of very serious potential prejudice, because the electrical discharge can result in loss of limb and bowel control.

This Court cannot say that it was unreasonable for the trial judge to decide that the jury's observation of petitioner's stun belt, coupled with the statement that he was being treated like "Hannibal Lector," could not be cured by an instruction.  This is not a case where a simple curative instruction would have eliminated the inherent threat of unfair

22

prejudice to petitioner and sufficiently protected against juror bias.  *See Harpster*, 128 F.3d at 330.

Likewise, the trial judge's determination that petitioner would gain an unfair advantage from the denial of the motion for mistrial was not unreasonable under the unique facts of this case.  As explained above, the record amply supports the judge's determination that petitioner's misstatements and his mischaracterizations of the law, evidence, and roles of the court and prosecutor during his opening statement were intended to portray petitioner as a "victim" of an unjust legal system and aimed at gaining the jury's sympathy.  Neither party has a right to have his case decided by a jury which may be tainted by bias.  Under these circumstances, the public's interest in fair trials designed to end in just judgments must prevail over petitioner right to have his trial concluded before the first jury impaneled.  *Washington*, 434 U.S. at 514-16.

The trial judge's written opinion clearly sets forth the alternatives he considered and why such options were not feasible under the circumstances of this case.  The fact that he did not explicitly relate those alternatives before declaring the mistrial does not mean that he did not consider the alternatives while the opening statement was proceeding.  It is clear that mid-way through petitioner's opening statement the trial judge was aware that petitioner's misconduct raised concerns of jury bias or prejudice in his mind, and that he considered the option of a mistrial and informed petitioner of that fact.

The trial judge's determination that a mistrial was the only way to preserve the right to a fair and impartial trial for both petitioner and the State must be upheld if there is a

sound basis in the record for his conclusion that the jurors *might* have been influenced by the improper considerations set forth above.  *See Washington*, 434 U.S. at 511-12 (mistrial justified by possibility of bias); *United States v. Sisk*, 629 F.2d 1174, 1180 (6th Cir. 1980).

Having thoroughly reviewed the trial record, this Court finds sound and ample support for the trial judge's determination of potential juror bias and for a finding of manifest necessity.  Under the circumstances of this case, the trial judge exercised sound discretion in declaring a mistrial that was justified by manifest necessity.  Moreover, the trial court's decision to deny petitioner's motion to dismiss his second trial on double jeopardy grounds did not involve an unreasonable application of the United States Supreme Court's precedents pertaining to the manifest necessity standard.  Accordingly, the retrial of petitioner does not violate petitioner's protections under the Double Jeopardy Clause.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241 (Doc. 3) should be **DENIED**.

2. A certificate of appealability should not issue with respect to the claim alleged in the petition because petitioner has failed to make a substantial showing of the denial of a constitutional right based on the claim.  *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. The Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would not be taken in "good faith" and, therefore, DENY petitioner leave to proceed on appeal *in forma pauperis* upon a

24

showing of financial necessity.  *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).


Date: _5/19/06_____                         _s/Timothy S. Black_____
        KL                                  Timothy S. Black
                                            United States Magistrate Judge


J:\Blackts\klein06-164 double jeopardy (1).wpd

25

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

THOMAS KLEIN,                                    Civil Action No. 1:06-cv-164
     Petitioner,

                                            Dlott, J.
     vs.                                         Black, M.J.

SIMON LEIS, JR.,
     Respondent

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Black, United States Magistrate Judge, in the above-entitled habeas corpus action.  Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof.   Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s).  Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections.  *See* Fed. R. Civ. P. 72(b).  A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal.  *See Thomas v. Arn,* 474  U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

1:06 cv 164  Doc. 20

| SENDER: *COMPLETE THIS SECTION* | *COMPLETE THIS SECTION ON DELIVERY* |
|---|---|

■ Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
■ Print your name and address on the reverse so that we can return the card to you.
■ Attach this card to the back of the mailpiece, or on the front if space permits.

A. Signature

X ☐ Agent ☐ Addressee

B. Received by ( *Printed Name*)  C. Date of Delivery

1. Article Addressed to:

Thomas Klein 1142890
Hamilton County Justice Center
1000 Sycamore Street
Cinti, OH 45202

D. Is delivery address different from item 1? ☐ Yes
If YES, enter delivery address below: ☐ No

3. Service Type
☑ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? *(Extra Fee)*   ☐ Yes

2. Article Number
   (Transfer from service label)        7002 0860 0000 1409 2054

PS Form 3811, August 2001        Domestic Return Receipt        102595-02-M-0835